## Buitrago v 600 Broadway Partners LLC

2025 NY Slip Op 31256(U)

April 10, 2025

Supreme Court, New York County

Docket Number: Index No. 158678/2020

Judge: Verna L. Saunders

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:     **HON. VERNA L. SAUNDERS, JSC**     PART  36

*Justice*

-----------------------------------------------------------------------X

HENDERSON BUITRAGO and
LUISA GOMEZ,

           Plaintiffs,

          - v -

600 BROADWAY PARTNERS LLC and
MJM ASSOCIATES CONSTRUCTION LLC,
           Defendants.

-----------------------------------------------------------------------X

MJM ASSOCIATES CONSTRUCTION LLC,
           Third-Party Plaintiff,

        -against-

KJE CONSTRUCTION SERVICES INC.,
           Third-Party Defendant.

-----------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 158678/2020 |
| MOTION SEQ. NO. | 001 |

**DECISION + ORDER ON
MOTION**

Third-Party
Index No. 595053/2021

The following e-filed documents, listed by NYSCEF document number (Motion 001) 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76

were read on this motion to/for         **SUMMARY JUDGMENT**         .

      This is an action to recover damages for personal injuries allegedly sustained by a construction worker on October 11, 2019, when, while working at a construction site located at 600 Broadway Avenue, New York, New York (the, "premises"), he fell from a temporary platform that shifted after being struck by an object.

      Defendant/third-party plaintiff 600 Broadway Partners LLC ("Broadway") and MJM Associates Construction LLC ("MJM") (together, "defendants") now move, pursuant to CPLR 3212, for summary judgment dismissing the common law negligence and Labor Law §§ 200 and 241(6) claims against them and for summary judgment in favor of MJM on its third-party contractual indemnification and breach of contract for the failure to procure insurance claims against third-party defendant KJE Construction Services Inc. ("KJE").[1]

      On the day of the accident, Broadway owned the premises. Broadway hired MJM as the general contractor for a project at the premises that entailed, *inter alia,* the demolition of the interior of the premises (the, "project"). MJM hired KJE to perform the interior demolition work. Plaintiff Henderson Buitrago ("plaintiff") was employed by KJE.[2]

---

[1] Labor Law § 240(1) is pleaded, but not addressed on this motion.

[2] Co-plaintiff Louisa Gomez's claims are not addressed in this motion.

[* 1]

Plaintiff testified that on the day of the accident, he was working at the premises. He was unaware of who employed him, though later he learned it was KJE (NYSCEF Doc. No. 45 at 46, *plaintiff's ebt*). His supervisors were "Armando" (*id.* at 38) and "Narcio" (*id.* at 46) (Narcio was later identified as "Marcio" by KJE's owner).[3] Marcio was a KJE employee (*id.* at 46). Plaintiff was paid by KJE (*id.* at 46). He was unfamiliar with Broadway and/or MJM.

Plaintiff's work included demolition, including removal of "the floors, the walls, the ceilings" (*id.* at 49). On the day of the accident, plaintiff and a coworker were assigned to "the third floor" of the premises (*id.* at 57). They were tasked by Marcio to "take down walls" (*id.* at 58) and remove "the rafters" (*id.* at 59). The rafters were "several layers of metal sheet" that "were a part of the roof" (*id.* at 61).

On the day of the accident, Marcio directed plaintiff to climb a 12-foot-tall ladder to reach an "OSHA plank" (the, "plank") (*id.* at 62) that was placed across joists that were approximately 12 feet above the floor (*id.* at 63). The joists were 16 inches apart (*id.* at 73). The plank was not secured to the joists (*id.* at 74). To remove the rafters, plaintiff would climb the ladder, stand on the plank and remove screws connecting the metal sheets of the rafters to the roof (*id.* at 64). Plaintiff would then "hit the rafters with a big hammer" to loosen it (*id.* at 69). Once loosened, he would then lower it to the floor below with the assistance of his coworker at the base of the ladder (*id.* at 69).

Prior to the accident, plaintiff and his coworker successfully removed eleven (11) rafters. While removing the twelfth (12th) rafter, he "hit [the rafter] once or twice, and immediately, the rafter fell and hit the OSHA plank, making it slide to the right" (*id.* at 72). This made plaintiff "lose [his] balance" causing him to "f[a]ll between the joist[s]" down to the floor below (*id.* at 72). The plank then fell and hit plaintiff's legs (*id.* at 72). Plaintiff's coworker, "Carlos." witnessed the accident (NYSCEF Doc. No. 46 at 15, *plaintiff's second ebt*).

Milton Sonneberg testified that on the day of the accident, he was employed by non-party ACHS Management Corp. ("ACHS"), a real estate management company. ACHS manages the premises. He confirmed that Broadway was the owner of the premises (NYSCEF Doc. No. 47 at 9-10, *Sonneberg ebt*). He confirmed that Broadway hired MJM as the "general contractor that was performing work" at the premises (*id.* at 12). He did not know who hired subcontractors. He was unfamiliar with KJE (*id.* at 36). He was unaware of the contents of any contracts between Broadway and MJM, or MJM and any subcontractors (*id.* at 19-20).

Jorman Rocha testified that on the day of the accident, he was an estimator for MJM. His duties included "collecting bids . . . bid leveling [and] scope of work leveling" (NYSCEF Doc. No. 48 at 7, *Rocha ebt*). He conducted the estimate for the project. He was not involved in preparing the contract for the project (*id.* at 14). Rocha also testified that he was not involved in the project itself, though at the beginning of the project, he would visit the premises to view the progress. If he saw an unsafe condition, he had the authority to stop work (*id.* at 79), but he could not direct any worker on how to perform their work (*id.* at 80). Rocha testified that MJM was hired as a construction manager. He acknowledged that MJM was also the general

---

[3] For clarity, herein, the court will refer to "Narcio" as "Marcio."

contractor for the project (*id.* at 17). MJM's work on the project included the interior demolition of the first three floors of the premises, as well as the cellar and subcellar (*id.* at 13). MJM hired KJE to perform the demolition. At the time of the accident, KJE was the only subcontractor on site (*id.* at 24). Rocha learned of the accident shortly after it happened, when he received a telephone call informing him that there was "an incident on site and 9-1-1 was called" (*id.* at 21). He did not fill out an accident report, though he was aware that there was an accident report. Rocha was shown a two-page document which he identified as the accident report. He did not know if it was the entire report, or just a part of it (*id.* at 42). After he learned of the accident, he went to the premises and spoke with KJE's foreman. He learned that a worker was "carrying a piece of timber that fell on his foot" (*id.* at 25). He did not know if the foreman witnessed the accident. He later testified that the foreman told him that a worker had fallen, but he did not know where he fell or from how high (*id.* at 38).

Louis Pascuito testified that on the day of the accident, he was KJE's owner and president (NYSCEF Doc. No. 49 at 6, *Pascuito ebt*). KJE was a demolition company. It was hired by MJM to work on the project (*id.* at 9). KJE had several foremen on the project, "Marcio" (*id.* at 59), "Armando" (*id.* at 20), and "Neph" (*id.* at 20). Pascuito was shown a copy of a contract between KJE and MJM for the project (the "KJE/MJM agreement"), and he confirmed that it was an accurate copy of the agreement (*id.* at 11). Under the agreement, KJE was responsible for providing materials, equipment and labor to effectuate the demolition work (*id.* at 18). KJE provided its employees with tools and equipment, and safety equipment if needed (*id.* at 19), including ladders and Bakers scaffolds (*id.* at 35). KJE supervised and directed its workers (*id.* at 35). To his knowledge, no other entity directed or supervised KJE's workers (*id.* at 35). Pascuito was unfamiliar with the prime contract between MJM and Broadway. He confirmed that, pursuant to the KJE/MJM agreement, KJE was required to procure primary and excess insurance naming MJM and the property owner as additional insureds (*id.* at 24). According to Pascuito, workers did not use OSHA planks as platforms, except when such planks were a part of scaffolds (*id.* at 39-40 ["that would not be the normal means of operations"]). Had he noticed a KJE worker using unsecured planks as a platform, he would have stopped that employee (*id.* at 40). Pascuito was made aware of the accident after it occurred, but he did not know the specifics of what happened. He did not investigate the accident. He was aware that an accident report was prepared, but he was unsure who had prepared it (*id.* at 50-51). Pascuito was shown an MJM accident report, which indicated that plaintiff was injured when he dropped a piece of wood on to his leg (*id.* at 51). He had never seen the MJM accident report before (*id.* at 52). Pascuito was also shown a copy of a witness statement that indicated that plaintiff fell from a height of approximately 6 to 7 feet (*id.* at 53). He was unfamiliar with the witness statement.

Defendant provides a copy of an MJM accident report. It is unsigned and undated. It notes the accident occurred on October 12, 2019 (one day after the accident occurred) (Notice of Motion, Exhibit J at 11; NYSCEF Doc. No. 53). It states that plaintiff "was carrying a piece of limber . . . when he let it fall and hit his leg" (*id.*). It also attaches a witness statement from plaintiff's coworker that states that plaintiff was "working on a plank" when "suddenly [plaintiff] fell" (*id.* at 15).[4]

---

[4] Aside from annexing the documents, defendants do not reference the accident report or the witness statement in their arguments.

[* 3]

"[T]he proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact. Failure to make such prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers" (*Pullman v Silverman,* 28 NY3d 1060, 1062 [internal quotation marks and citations omitted]). Once prima facie entitlement has been established, in order to defeat the motion, the opposing party must "'assemble, lay bare, and reveal his [or her] proofs in order to show his [or her] defenses are real and capable of being established on trial . . . and it is insufficient to merely set forth averments of factual or legal conclusions'" (*Genger v Genger,* 123 AD3d 445, 447 [1st Dept 2014], quoting *Schiraldi v U.S. Min. Prods.,* 194 AD2d 482, 483 [1st Dept 1993]). "Summary judgment must be denied where there is any doubt as to the existence of a triable issue . . . or where the issue is arguable" (*Genesis Merchant Partners, L.P. v Gilbride, Tusa, Last & Spellane, LLC,* 157 AD3d 479, 482 [1st Dept 2018] [internal quotation marks and citations omitted]).

As an initial matter, in plaintiff's opposition to defendants' motion, plaintiff affirmatively withdrew the common-law negligence and Labor Law § 200 claims against defendants (NYSCEF Doc. No. 66 ¶ 4, *affirmation in opposition*). Accordingly, as plaintiff has affirmatively withdrawn these claims, that portion of defendants' motion that seeks dismissal of these claims is rendered moot.

As to that branch of the motion seeking dismissal of plaintiff's Labor Law § 241(6) claims, Labor Law § 241(6) provides, in pertinent part, as follows:

> "All contractors and owners and their agents, . . . when constructing or demolishing buildings or doing any excavating in connection therewith, shall comply with the following requirements:
>
> * * *
>
> (6)  All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, [and] equipped . . . as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places."

Labor Law § 241(6) imposes a nondelegable duty of reasonable care upon owners and contractors "'to provide reasonable and adequate protection and safety' to persons employed in, or lawfully frequenting, all areas in which construction, excavation or demolition work is being performed" (*Rizzuto v L.A. Wenger Contr. Co.,* 91 NY2d 343, 348 [1998]). To sustain a Labor Law § 241(6) claim, it must be established that the defendant violated a specific, "concrete specification" of the Industrial Code, rather than a provision that considers only general worker safety requirements (*Messina v City of New York,* 300 AD2d 121, 122 [1st Dept 2002]). Further, "a plaintiff must demonstrate that his or her injuries were proximately caused by a violation of an Industrial Code regulation that is applicable to the circumstances of the accident" (*Yaucan v Hawthorne Vil., LLC,* 155 AD3d 924, 926 [2d Dept 2017]]; see also *Sutherland v Tutor Perini Bldg. Corp.,* 207 AD3d 159, 161 [1st Dept 2022]). "Whether a regulation applies to a particular condition or circumstance is a question of law for the court" (*Harrison v State of New York,* 88 AD3d 951, 953 [2d Dept 2011]).

Notably, plaintiff lists multiple violations of the Industrial Code in his complaint and bill of particulars. However, except for section 23-1.7(b)(1), plaintiff does not oppose their dismissal. Therefore, these uncontested provisions are deemed abandoned (*Kempisty v 246 Spring St., LLC*, 92 AD3d 474, 475 [1st Dept 2012]).

Industrial Code section 23-1.7(b)(1) is sufficiently specific to support a Labor Law § 241(6) claim (see *Cordeiro v TS Midtown Holdings, LLC*, 87 AD3d 904, 906 [1st Dept 2011]). It governs "Hazardous openings" and provides as follows:

> "(i) Every hazardous opening into which a person may step or fall shall be guarded by a substantial cover fastened in place or by a safety railing constructed and installed in compliance with this Part (rule).

> "(ii) Where free access into such an opening is required by work in progress, a barrier or safety railing constructed and installed in compliance with this Part (rule) shall guard such opening and the means of free access to the opening shall be a substantial gate. Such gate shall swing in a direction away from the opening and shall be kept latched except for entry and exit.

> "(iii) Where employees are required to work close to the edge of such an opening, such employees shall be protected as follows:

>> (a) Two-inch planking, full size, or material of equivalent strength installed not more than one floor or 15 feet, whichever is less, beneath the opening; or
>> (b) An approved life net installed not more than five feet beneath the opening; or
>> (c) An approved safety belt with attached lifeline which is properly secured to a substantial fixed anchorage.

In its motion, defendants argue that section 23-1.7(b)(1) as a whole cannot apply to the accident because the space between two joists that plaintiff fell through (when the plank he was standing on shifted after being struck by the falling rafter) did not constitute a hazardous opening. Defendants' argument is correct. In *Bisram v Long Is. Jewish Hosp.*, 116 AD3d 475 (1st Dept 2014), the metal beam holding the platform the plaintiff was standing on shifted, causing him to fall between beams from one floor to another. The *Bisram* court held that such a fall "did not constitute a hazardous opening within the meaning" of section 23-1.7(b)(1) (*id.* at 476; see also *Forschner v Jucca Co.*, 63 AD3d 996 [2d 2009] [holding that the "regulation applies to safety devices for hazardous openings, and not to an elevated hazard"]). Here, similar to *Bisram*, the plank shifted, causing plaintiff to fall between two joists from one level to another. Accordingly, as the gap between the joists does not constitute a "hazardous opening" as contemplated by the Industrial Code, this provision does not apply to plaintiff's accident. Plaintiff argues that defendants did not sufficiently substantiate this argument in their motion in chief, as the issue was raised, but no cases were cited in support. However, the issue itself was

raised, and plaintiff presented meaningful opposition. Defendants then sufficiently substantiated the argument in reply to plaintiff's opposition. Given the foregoing, defendants are entitled to summary judgment dismissing the Labor Law § 241(6) claim predicated upon a violation of 12 NYCRR 23-1.7(b)(1).

Next, MJM moves for summary judgment in its favor on their third-party contractual indemnification claim against KJE. "A party is entitled to full contractual indemnification provided that the 'intention to indemnify can be clearly implied from the language and purposes of the entire agreement and the surrounding facts and circumstances'" (*Drzewinski v Atlantic Scaffold & Ladder Co.*, 70 NY2d 774, 777 [1987], quoting *Margolin v New York Life Ins. Co.*, 32 NY2d 149, 153 [1973]; *see also Tonking v Port Auth. of N.Y. & N.J.*, 3 NY3d 486, 490 [2004]). "In contractual indemnification, the one seeking indemnity need only establish that it was free from any negligence and was held liable solely by virtue of the statutory liability" (*Correia v Professional Data Mgt.*, 259 AD2d 60, 65 [1st Dept 1999]; *see also Murphy v WFP 245 Park Co., L.P.*, 8 AD3d 161, 162 [1st Dept 2004]). Unless the indemnification clause explicitly requires a finding of negligence on behalf of the indemnitor, "[w]hether or not the proposed indemnitor was negligent is a non-issue and irrelevant" (*Correia*, 259 AD2d at 65). Notably, while counsel for defendants seeks affirmative relief with respect to MJM and Broadway, the third-party complaint is brought only by MJM. Accordingly, as Broadway has not pleaded a claim, the court will only address MJM's claim.

The KJE/MJM agreement (NYSCEF Doc. No. 51, *KJE/MJM agreement*) contains an indemnification provision (the "First Indemnification Provision") that provides the following:

> "To the fullest extent permitted by law [KJE] shall indemnify and hold harmless [Broadway], [MJM] . . . and agents and employees of any of them from and against claims . . . arising out of or resulting from performance of [KJE's] Work under this Subcontract . . . but only to the extent caused by the negligent acts or omissions of [KJE] . . ." (*id.*, § 4.7).

Exhibit F to the KJE/MJM agreement (*id.* at 70-72) also contains an indemnification provision (the "Second Indemnification Provision"). It provides the following, as relevant:

> "To the fullest extent permitted by law, [KJE] shall indemnify and hold [600 Broadway and MJM] harmless from and against any and all claims . . . arising from the acts, errors, or omissions or violations of law of [KJE] . . . while on or near the project, or while performing contract related work . . ." (*id.* at 70).

Notably, Exhibit F to the KJE/MJM agreement contains a conflicts clause that states that, in the event of a conflict between the agreement and Exhibit F, the terms of Exhibit F "shall prevail" (*id.* at 72). Accordingly, the Second Indemnification Provision is the active provision in this matter. The Second Indemnification Provision, unlike the First Indemnification Provision, does not require a finding of negligence. To trigger this provision, the accident only needs to arise out of activities that occur "while performing contract related work" at the project (*id.* at

71). Here, it is undisputed that plaintiff's accident occurred during his work for KJE at the project. Therefore, the accident arose from KJE's work on the project. Accordingly, the indemnification provision applies to the subject accident.

Next, MJM argues that it is free from negligence because it did not have the authority to supervise or control plaintiff's work. It argues that, absent this authority, it would be free from any negligence that would bar summary judgment in its favor on the indemnification claim.

Plaintiff's accident occurred when the unsecured plank he was provided to stand on to perform his work moved and caused plaintiff to fall. This claim implicates the means and methods of the work. Where a plaintiff's claims implicate the means and methods of the work, "a contractor will not be held liable under the common-law or Labor Law § 200 unless it had the authority to supervise or control the performance of the work" (*LaRosa v Internap Network Servs. Corp.*, 83 AD3d 905, 909 [2d Dept 2011]; *DaSilva v Toll First Ave., LLC,* 199 AD3d 511, 513 [1st Dept 2021]; *Andino v Wizards Studios N. Inc.*, 223 AD3d 508, 509 [1st Dept 2024]). Specifically, "liability can only be imposed against a party who exercises *actual* supervision of the injury-producing work" (*Naughton v City of New York*, 94 AD3d 1, 11 [1st Dept 2012]).

Specifically, MJM argues that KJE was the only entity responsible for supervising and controlling plaintiff and his work, and that it negligently failed to provide plaintiff with proper safety devices to prevent his fall. MJM further argues that it did not have the authority to supervise or control plaintiff's work. Therefore, MJM argues, it would be free from any negligence that would bar summary judgment in its favor on the contractual indemnification claims (*Correia*, 259 AD2d at 65).

Notably, plaintiff agreed to withdraw the common-law negligence and Labor Law § 200 claims against defendants. That does not, however, establish freedom from negligence, as a matter of law. That said, plaintiff testified that he was supervised by Marcio from KJE (plaintiff's tr at 46), and that Marcio directed his work on the day of the accident (*id.* at 62). Similarly, Pascuito confirmed that only KJE directed and supervised its employees (*id.* at 35). There is no testimony or documentary evidence supporting that MJM had any actual authority over the injury producing work – plaintiff's work or the securing of the plank. Therefore, as MJM did not supervise or control the injury producing work, it cannot be liable for negligence under the Labor Law or the common-law (*LaRosa*, 83 AD3d at 909).

In opposition, KJE argues that questions of fact exist regarding whether MJM supervised plaintiff's work. Specifically, they argue that MJM had the authority to stop work (Rocha tr at 79). However, the authority to stop work constitutes only general supervisory control, which is insufficient to impute liability under section 200 (*see Bisram v Long Is. Jewish Hosp.*, 116 AD3d 475, 476 [1st Dept 2014]).

KJE also argues that a question of fact exists regarding whether the rafter that plaintiff was removing as a part of his work constituted a hazardous condition. Such argument is unpersuasive (*see e.g., Villanueva v 114 Fifth Ave. Assoc. LLC*, 162 AD3d 404, 406 [1st Dept 2018] ["Where a defect is not inherent but is created by the manner in which the work is performed, the claim under Labor Law § 200 is one for means and methods and not one for a

dangerous condition existing on the premises"). The accident was caused by the failure to secure the plank that served as plaintiff's platform during his demolition work, not by a dangerous condition inherent in the premises. Therefore, given the foregoing, MJM is entitled to summary judgment in its favor on its contractual indemnification claim against KJE.

MJM moves for summary judgment in their favor on its third-party claim for breach of contract for the failure to procure insurance. "A party moving for summary judgment on its claim for failure to procure insurance meets its prima facie burden by establishing that a contract provision requiring the procurement of insurance was not complied with. The burden then shifts to the opposing party, who may raise an issue of fact by tendering the procured insurance policy in opposition to the motion" (*Benedetto v Hyatt Corp.*, 203 AD3d 505, 506 [1st Dept 2022]).

The KJE/MJM agreement contains an insurance procurement provision (the, "Insurance Procurement Provision") that requires KJE to procure a commercial general liability policy with limits of $1 million per occurrence/$2 million aggregate, and an excess policy in the amount of $5 million (Notice of Motion, Exhibit H, at 70). It further requires that KJE "shall deliver Additional Insureds a certificate of insurance . . . naming Additional Insureds as an additional insured on the insurance policy issued to [KJE]" (*id.*, at 70). The term "Additional Insureds" is defined to include both Broadway and MJM (*id.* at 70). The insurance policy procured by KJE contains an additional insured endorsement. It provides that "Who Is An Insured is amended to include as an additional insured the person(s) or organization(s) shown in the schedule" (*id.* at 48). The schedule, found on the endorsement itself, includes MJM, but not Broadway (*id.*, exhibit J, at 48). MJM argues that the primary insurance procured by KJE does not provide the required coverage because it fails to offer additional insured status to Broadway, as required by the Insurance Procurement Provision.

In opposition, KJE, citing to the same Additional Insured endorsement, argues that the Insurance Procurement Provision provides the requisite coverage. A review of the policy confirms that Broadway is not listed as an additional insured in the policy's Additional Insured endorsement (*id.*). Accordingly, KJE did not procured a policy that comports with the Insurance Procurement Provision.

MJM also argues that KJE did not procure the required excess insurance policy, noting that KJE has not produced such policy. The record does not contain any evidence that KJE procured an excess policy. In opposition, KJE does not provide a copy of an excess policy (*Benedetto*, 203 AD3d at 506 [opposing party may raise an issue of fact "by tendering the procured insurance policy in opposition to the motion"]).

Given the foregoing, MJM is entitled to summary judgment in its favor on its claim for breach of contract for the failure to procure insurance against KJE, though the court notes that MJM's recovery under this claim "is limited to the loss it actually suffers by reason of the breach" – i.e. actual out-of-pocket expenses (*Inchaustegui v 666 5th Ave. Ltd. Partnership*, 96 NY2d 111, 116 [2001]). The parties remaining arguments have been considered and were found unpersuasive. For the foregoing reasons, it is hereby

**ORDERED** that plaintiff's common law negligence and Labor Law § 200 claims are deemed withdrawn (NYSCEF Doc. No. 66 ¶ 4); and it is further

**ORDERED** that the part of defendant/third-party plaintiff 600 Broadway Partners LLC (Broadway) and MJM Associates Construction LLC's (MJM) motion, pursuant to CPLR 3212, for summary judgment dismissing the common law negligence and Labor Law § 200 claims is denied as moot; and it is further

**ORDERED** that the branch of defendants' motion, pursuant to CPLR 3212, for summary judgment dismissing the Labor Law § 241(6) claims against them is granted, and that claim is dismissed; and it is further

**ORDERED** that the part of defendants' motion, pursuant to CPLR 3212, for summary judgment in MJM's favor on its third-party contractual indemnification and breach of contract for the failure to procure insurance claims against third-party defendant KJE Construction Services Inc., is granted; and it is further

**ORDERED** that, within twenty (20) days after this decision and order is uploaded to NYSCEF, counsels for 600 Broadway Partners LLC and MJM Associates Construction LLC shall serve a copy of this decision and order, with notice of entry, upon all parties.

This constitutes the decision and order of the court.

_____**April 10, 2025**_____

_____
**HON. VERNA L. SAUNDERS, JSC**

| CHECK ONE: | ☐ CASE DISPOSED | | ☒ NON-FINAL DISPOSITION | |
|---|---|---|---|---|
| | ☐ GRANTED | ☐ DENIED | ☒ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |